J-S27018-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: G.J., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 982 EDA 2022 |

Appeal from the Order Entered March 15, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000737-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: J.M.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: G.J., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 983 EDA 2022 |

Appeal from the Decree Entered March 15, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000081-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: M.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: G.J., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 984 EDA 2022 |

Appeal from the Order Entered March 15, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000163-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: M.A.G.J.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |

J-S27018-22

                                        :
                                        :
                                        :
   APPEAL OF: G.J., FATHER              :
                                        :
                                        :
                                        :
                                        :
                                        :    No. 985 EDA 2022

Appeal from the Decree Entered March 15, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000082-2021

BEFORE:  STABILE, J., NICHOLS, J., and SULLIVAN, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED NOVEMBER 14, 2022**

Appellant G.J. (Father) appeals from the decree and order granting the petitions filed by the Philadelphia County Department of Human Services (DHS) to involuntarily terminate Father's parental rights to his minor children, J.B., born in September of 2013, and M.J., born in November of 2018, (collectively, the Children)[1] and change the Children's permanency goal to adoption.  Father argues that DHS failed to present clear and convincing evidence supporting the termination of his parental rights and failed to consider Children's best interests in changing the permanency goal to adoption.  We affirm.

The relevant facts and procedural history are well known to the parties.  **See** Trial Ct. Op., 5/5/22, at 1-4.  Briefly, DHS became involved with the family on August 8, 2018, after receiving a general protective services (GPS) report alleging that A.B. (Mother) had been physically abusing J.B. and his

_____

[1] M.J. and J.B. are the minor children of Father and A.B. (Mother).  The Children also have half-siblings who are not included in the instant appeal.

- 2 -

older half siblings. N.T. Hr'g, 3/15/22, at 7, 20-22. From October of 2018 through January of 2019, DHS provided in-home services for Mother. *Id.* at 59. After Mother gave birth to M.J. in November of 2018, DHS received additional reports alleging Mother's "repeated, prolonged, or egregious failure to supervise" or obtain proper medical care for the Children. *Id.* at 55. Throughout the time DHS provided services to Mother, DHS did not have contact information for Father and had never seen him in Mother's home. *Id.* at 58-59.

On January 29, 2019, DHS obtained an order of protective custody (OPC) and placed the Children with Maternal Cousin. Following a shelter care hearing on January 31, 2019, the trial court lifted the OPC, transferred temporary legal custody of the Children to DHS, and maintained the Children's placement with Maternal Cousin. The trial court also appointed counsel on Father's behalf.

On June 6, 2019, the trial court adjudicated the Children dependent and transferred both the care and custody of the Children to DHS. In support of the Children's permanency goal of reunification, Father was referred to Achieving Reunification Center (ARC) for appropriate services and ordered to complete a parenting capacity evaluation (PCE). *See* Goal Change Pet., 2/16/21, Ex. A. The court also ordered Community Umbrella Agency (CUA) to assess Father's home and permitted Father to attend twice weekly supervised visits with the Children. *Id.*

On July 23, 2019, CUA held a revised single case plan (SCP) meeting. *See* Goal Change Pet., 2/16/21, Ex. A.  Father's parental objectives were to comply with CUA services and court orders, complete a PCE, and attend ARC services.  *Id.*  Father did not participate in the SCP meeting.  *Id.*

On October 10, 2019, the trial court conducted a permanency review hearing.  Father was referred to ARC for parenting classes, ordered to comply with the PCE when scheduled, and provide proof of employment.  *See* Goal Change Pet., 2/16/21, Ex. A.  The trial court also ordered CUA to evaluate Father's home within forty-eight hours.  *Id.*  Father's twice-weekly supervised visitation schedule remained in place.  *Id.*

The trial court conducted permanency review hearings at regular intervals.  Throughout the life of the case, Father's SCP objectives remained the same.  *Id.*  At the permanency review hearing on October 27, 2020, CUA case manager Jasmine Jackson testified that although Father verified his employment status, he failed to complete ARC as ordered.  N.T. Hr'g, 10/27/20, at 13.  The trial court also heard testimony that Father had stopped visiting or calling the Children for at least two months and that he had only re-engaged in visitation at the beginning of September 2020.  *Id.* at 13-14.  At the conclusion of the hearing, the trial court indicated that it would consider changing the Children's permanency goal and terminating Father's parental rights at the next hearing.  *Id.* at 65.  In the interim, the trial court ordered Father to complete the PCE, engage in parenting classes, and continue with his visitation schedule.  *Id.* at 67.

On February 16, 2021, DHS filed petitions to change the Children's permanency goal to adoption. ***See*** Goal Change Pet., 2/16/21. In support, DHS alleged that reunification with Father was inappropriate, as he had "failed to achieve full and continuous compliance with the established SCP objectives" and "also failed to consistently visit, plan for, and provide for [the Children] throughout their time in placement." ***Id.*** at Ex. A. That same day, DHS filed a petition seeking involuntary termination of Father's parental rights to Children pursuant to 23 Pa.C.S. §§ 2511(a)(1), (a)(2), (a)(5) and (a)(8). ***See*** Pet. for Involuntary Term., 2/16/21, at 1-11.

The trial court conducted virtual evidentiary hearings on April 28, 2021 and June 1, 2021.[2] DHS presented testimony from CUA case worker Jasmine

_____

[2] Blake Mammuth, Esq. served as the Children's guardian *ad litem* (GAL) throughout the proceedings and represented the Children's best interests. Attorney Mammuth also represented M.J.'s legal interests. N.T. Hr'g, 10/27/20, at 65; ***see In re Adoption of K.M.G.***, 240 A.3d 1218 (Pa. 2020). The record reflects that M.J. has extensive development delays and was entirely non-verbal at the time of the termination proceedings. N.T. Hr'g, 10/27/20, at 33-35; N.T. Hr'g, 4/28/21, at 118. Because M.J. could not express his own preferences, the trial court did not appoint legal counsel on his behalf. N.T. Hr'g, 10/27/20, at 65; ***see In re P.G.F.***, 247 A.3d 955, 964 (Pa. 2021) (holding that when a child's best interests and legal interests do not diverge, or where the child's legal interests cannot be ascertained, a court-appointed attorney may serve in the dual capacity of GAL and legal counsel).

Michael Graves, Esq., served as J.B.'s legal counsel during the termination proceedings, and appeared at the hearings on his behalf. N.T. Hr'g, 4/28/21, at 8. Attorney Graves testified that J.B. appeared to understand his options, including adoption. N.T. Hr'g, 6/1/21, at 73. Attorney Graves stated that J.B. said he was "fine where he is now" in foster care and "[h]e would like to be adopted[,]" but also specifically stated that he wanted to maintain visitation with his parents and his prior caretakers. ***Id.*** at 73-74.

Jackson, who stated that Father had failed to meet his SCP objectives. N.T. Hr'g, 4/28/21, at 95. With respect to parenting classes, Ms. Jackson stated that although Father was referred to ARC several times, the referrals were closed for non-participation. *Id.* at 92. Ms. Jackson explained that she also provided Father with contact information for ARC, but "he didn't feel like he should have to do parenting class," because the issues leading to the Children's placement did not occur while they were in Father's custody. *Id.* at 93. Ms. Jackson testified that Father "[e]ventually [] stated that he had been reaching out to ARC, but that nobody was getting back to him." *Id.* Ms. Jackson also indicated that although Father ultimately engaged with ARC, he did not do so until May of 2021. *Id.*

Ms. Jackson testified that Father completed an initial home assessment in 2019. *Id.* at 94. Ms. Jackson explained that while Father's home was "not structurally inappropriate," Father's housing was an issue because the Children would have had to share a bedroom with both Father and Father's older child. *Id.* Ms. Jackson also noted that after Father was directed to complete another assessment, Father stated that Mother was handling the Children's housing, but later said that he "might be moving," and that he would let Ms. Jackson know when he was ready for a home assessment. *Id.* At the time of the termination hearing, Father's housing requirement remained outstanding. *Id.* at 95.

With respect to visitation, Ms. Jackson testified that Father was consistent until

October of 2019, at which point he stated that his work schedule was a barrier and he wasn't going to be able to attend the visits during the week. . . however[,] he didn't give me the work schedule which I needed to verify in order to give him Saturday visits until January of 2020."

*Id.* at 96. Ms. Jackson explained that after visits became virtual in March of 2020, Father completed three visits, then stated that "the Zoom wouldn't work for him, at which point he didn't have any more visits until they restarted in person in August of 2020." *Id.* Ms. Jackson stated that although Father visited with the Children from August of 2020 to November of 2020, two visits were subsequently cancelled due to weather, two visits were cancelled because J.B. did not want to attend, and three visits were cancelled because Father either failed to confirm them or indicated that he was unable to leave work. *Id.* As a result of Father's missed visits, Ms. Jackson stated that "[J.B.] was upset" and on the next scheduled visit in January of 2021, "[J.B.] said he didn't want to come to because [] Father had missed the ones before." *Id.* at 97. At that time, Father told Ms. Jackson that "M.J. was a baby and there wasn't a lot to do with him, so [Father] would wait [to resume visits] until [J.B.] wanted to join." *Id.* Father did not contact DHS about visiting with the Children in January, February, or March of 2021. *Id.* at 99. Father ultimately contacted DHS in April of 2021 and visits resumed after J.B. agreed to attend. *Id.*

Finally, with respect to the Children's best interests, Ms. Jackson testified that M.J. had extensive developmental needs and was completely non-verbal at two years' old. *Id* at 117-18. Ms. Jackson stated that in prior

conversations with Father, he indicated that he only wanted custody of J.B., "because he felt like [M.J.] was a baby and needed to be with [Mother]." *Id.* at 119. Ms. Jackson explained that although J.B. had become upset about missed visits with Father in the past, J.B. no longer "displayed any negative effects of not having contact with [F]ather" and would not suffer irreparable harm if Father's rights were terminated. *Id.* at 100-101. She also stated because M.J. is young and has been in care for most of his life, he "hasn't had time to develop a bond with [] Father" and would not suffer irreparable harm if Father's rights were terminated. *Id.* at 102.

Although Father gave some testimony at a virtual hearing on June 1, 2021, he experienced technical difficulties and was ultimately disconnected. N.T. Hr'g, 6/1/21, at 67-72. After Father's counsel indicated that he did not have updated contact information for Father, the trial court found that Father had waived his right to testify. *Id.* at 69-72. That same day, the trial court issued orders terminating Father's parental rights to the Children pursuant to Section 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b), and changing the Children's permanency goals to adoption.

Father subsequently appealed the trial court's goal change and termination orders as to both Children. On appeal, DHS filed an application to remand the matter for further proceedings. On January 6, 2022, this Court issued an order granting DHS's application and remanded the case to allow Father to testify. *See* Order, 1/6/22.

The trial court conducted an in-person hearing on March 15, 2022. Father testified that he has a house, he loves the Children, and he wants them returned to his custody. N.T. Hr'g, 3/15/22, at 26. Although Father confirmed that he previously told Ms. Jackson that he only wanted custody of his older son, J.B., Father stated that he "had a change of heart" and now wanted custody of both children. *Id.* at 34. He also indicated that while he had not been ready to care for M.J. previously, he did have the ability to care for the Children and would "have [them] if [Mother] wasn't ignorant." *Id.* at 44. When asked if he took any responsibility for the circumstances that led to the Children's placement, Father stated: "It's not on my watch. That happen[ed] with [Mother]. It didn't happen on my watch." *Id.* at 45.

Father indicated that, prior to the Children's removal in 2019, he was "hands on" with J.B., provided for the Children financially, and often had custody of J.B. on the weekends. *Id.* at 47. However, Father stated that he did not know M.J.'s age, date of birth, or whether M.J. had any special needs. *Id.* at 44-45. When Father was asked if he knew "anything about [M.J.]," who was removed from Mother's custody as an infant, Father responded: "Nope because y'all got him." *Id.* at 45.

When asked to explain why he failed to complete his SCP objectives, Father repeatedly stated that DHS "dropped the ball." *Id.* at 17, 36, 52. With respect to visitation, Father claimed that he showed up for visits on several occasions, but DHS had issues with staffing. *Id.* at 18. Regarding parenting classes, Father initially stated that he did not need parenting classes because

the problems that led to the Children's placement were "the baby mom department." *Id.* at 18. Father later claimed that he had been going to the classes, but he ultimately stopped going because "people [weren't] there" and he was "losing money" because he had to take time off from work. *Id.* at 38. Father also stated that he decided to stay away from the Children because he was frustrated, stressed out, and had "been going to that circus route for two years and everybody [kept] assassinating [his] character." *Id.* at 52. However, Father confirmed that he failed to complete the court-ordered parenting capacity evaluation. *Id.* at 40.

At the conclusion of the hearing, the trial court re-entered the decrees terminating Father's parental rights and the orders changing the Children's permanency goals to adoption.[3] Father subsequently filed a timely notice of appeal. Both Father and the trial court complied with Pa.R.A.P. 1925.

On appeal, Father raises the following issues for review:

1. Whether the trial court committed error by involuntarily terminating father [Father's] parental rights where such determination was not supported by clear and convincing evidence establishing grounds for termination under the Adoption Act, 23 Pa. C.S. §§ 2511 (a)(1), (a)(2), (a)(5) and (a)(8)?

2. Whether the trial court committed error by changing the [Children's] permanency goal from reunification with the parent(s) to adoption without giving primary consideration to the developmental, physical, and emotional needs and welfare

---

[3] However, the trial court noted that Father's parental rights were terminated pursuant to Section 2511(a)(1) and (a)(2), and it did not include subsections (5) or (8).

- 10 -

of the child as required by the Adoption Act, 23 Pa. C.S. § 2511(b)?

Father's Brief at 5 (some formatting altered).

**Termination of Parental Rights**

Section 2511(a)(1)

Father argues that the trial court erred in terminating his parental rights under Section 2511(a)(1) because he "never refused or failed to perform his parental duties" and testified at the termination hearing that "he loves [the Children] and that he wants to be reunited with them." *Id.* at 27. Father asserts that although he was not the Children's primary custodian, he "had been parenting and involved with [the C]hildren since their birth" and had "ongoingly provided for . . . and maintained a parental relationship" with them throughout their lives. *Id.* Further, Father emphasizes that "[t]he dependency issues that led to the children's removal from the home and placement into DHS foster care arose solely from [M]other." *Id.* Father also claims that, unlike Mother, he has no history of "neglect, mental health, parental abuse, [or] illegal substance abuse" and has maintained "independent housing and sufficient income to satisfactorily care for [the C]hildren without any county agency or state assistance." *Id.* Therefore, Father concludes that "in the absence of DHS establishing and implementing a meaningful reunification plan for [F]ather to comply with to facilitate reunification, and in its failure to provide [Father] reasonable services and assistance to meet the objectives of that plan, DHS failed in its burden" to

establish clear and convincing evidence supporting the involuntary termination of his parental rights under Section 2511(a)(1). *Id.*

In reviewing an appeal from an order terminating parental rights, we apply the following standard of review:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. [*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010)]. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.
>
> As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (some citations omitted).

The burden is on the petitioner "to prove by clear and convincing evidence that [the] asserted grounds for seeking the termination of parental rights are valid." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). We have explained that "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" *Id.* (citation omitted).

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b) . . . .

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Further, we "may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a)." *In re M.T.*, 101 A.3d 1163, 1179 (Pa. Super. 2014) (*en banc*) (citation omitted).

Section 2511(a)(1) provides as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either

- 13 -

> has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S. § 2511(a)(1).

> To meet the requirements of [Section 2511(a)(1)], "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." The court must then consider "the parent's explanation for his or her conduct" and "the post-abandonment contact between parent and child" before moving on to analyze Section 2511(b).

> This Court has explained that a parent does not perform his or her parental duties by displaying a "merely passive interest in the development of the child." Rather, "[p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances."

*In re J.T.M.*, 193 A.3d 403, 409 (Pa. Super. 2018) (citations omitted).

> With respect to "parental duties," this Court has explained:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance. This affirmative duty . . . requires continuing interest in the child and a genuine effort to maintain communication and association with the child. Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citations omitted and formatting altered).

Moreover, "[p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." *Id.* (citation omitted). "A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." *Id.* (citation omitted).

Where the petitioners have presented clear and convincing evidence that a parent has demonstrated a settled purpose of relinquishing parental rights or has refused or failed to perform parental duties, "the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b)." *Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 92 (Pa. 1998) (citation omitted).

Additionally, this Court has explained that

[t]o be legally significant, the [post-abandonment] contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question.

*In re Z.P.*, 994 A.2d 1108, 1119 (Pa. Super. 2010) (citations omitted).

- 15 -

Here, the trial court addressed the circumstances of Father's efforts towards reunification with the Children as follows:

Ms. Jackson testified she established SCP objectives for Father and discussed the objectives with him. Father's objectives were for him to contact ARC services for parenting[,] undergo a parenting capacity evaluation, undergo a home assessment, and employment verification. She testified [that] she made several referrals for parenting and also gave [Father] the contact information for ARC so he could call himself; however, Father did not attend. The referrals [Ms. Jackson] made were closed for non-participation. Initially, Father told [Ms. Jackson] that he didn't feel like he should have to do parenting class because the incident with J.B. did not occur while the child was with him. Then Father told [Ms. Jackson] he had contacted ARC, but nobody got back to him. Father finally did engage in March of 2021. Ms. Jackson stated [that] Father never indicated to her or took any responsibility for the reasons his Children remained in care. He continued to blame the Mother.

Ms. Jackson noted Father's home assessment was completed in November 2019. The home was not structurally inappropriate however, the issue was that [the Children] would have to share a bedroom with Father's other son who he has custody of. Recently, Father told her that the Mother was taking care of housing, then he told her he might be moving and would let her know when to do a home assessment, which never occurred. At this point, housing is an outstanding objective for Father.

Regarding the parenting capacity evaluation (PCE), Ms. Jackson testified it was court ordered on [June 6,] 2019. Father had an appointment scheduled for March 25, 2020. And they reached out to him to a telephone number that was out of service. Therefore, the evaluation remains an outstanding objective for Father.

Regarding visitation, Ms. Jackson testified Father was ordered to do visitation twice a week for one hour, but in February 2020, Father requested to do once a week for two hours. Father was consistent with visitation up until October of 2019, at which point he stated that his work schedule was a barrier and he wasn't going to be able to attend visits during the week. However, Father never gave her a work schedule to verify in order to give him Saturday visits until January of 2020. Father's visits then became virtual in

- 16 -

March of 2020, and then Father completed three visits. After that Father stopped the visiting because he said Zoom did not work for him and at that point, he did not have any more visits until they restarted in person in August 2020. Since then, Father visited until November 2020. Two visits were cancelled because of weather, and two visits with J.B. were not held because the child did not want to attend. Father then missed three visits because he was unable to attend because of work. By January 2021, J.B. stated he did not want any more visits. Father did not want to do visits just with M.J., so Father decided he would wait until J.B., wanted to rejoin the visits for the visits to restart. Visits then restarted in April of 2021, because Father reached out to her and asked her to restart the visits.

\*　　\*　　\*

This court heard testimony from Father, who stated the Children were not in his care when they were injured and that he did not know of the injuries until months later when J.B. came to his house. He testified that M.J. had not been born at that time and the arrangement he had with Mother was that he would get J.B. on the weekend and then drop him back with Mother. He stated he did not get along with Mother, so he blocked her, and they did not communicate and therefore did not see his son. Later they communicated again, and he began seeing his son.

\*　　\*　　\*

Regarding the FSP objectives, Father testified he did not complete classes nor training because the "dropped the ball" and he was losing money. Father testified he did not need classes because he does not have any of the issues that brought his Children to care. He stated it was "the baby mom department." Father testified he never missed a court date, except the last termination hearing in June. It was a Zoom video and that's why he did not show up. He noted he has come to hearings for two years: "I've been going to this circus show. I've always come here."

Regarding visitation with [the] Children, Father testified he would drive to see his son and they would not have any staff or it would be miscommunication with other staff. He noted plenty of times he would go up there and they did not have anybody there so he could not see his son. He would complain but get no response. Father testified visits were not made available to him and he would drive up from work in New York at that time. He noted a couple of visits were cancelled. Father stated when a lot of things were

shut down, he participated in virtual visits but stated the Foster Mom was the problem[,] that she was acting up[, did] not pick up the phone and he could not communicate with her. . . .

Trial Ct. Op. at 17-19 (some formatting altered).

After hearing Father's testimony at the March 15, 2022 hearing, the trial court explained:

So this case came back from the Superior Court to allow Father to offer his version of the facts. And I have two complete binders of notes of testimony which I have incorporated into the record which has all of the testimony of the case workers. Specifically, notes of testimony 4/28/21, and 6/1/21, the two hearings that I held. And what I heard from father is a narrative, which he made up. Completely untruthful, completely self-serving, completely uncredible. We have a father who leaves these children. Says that he spent time with them yet doesn't even know the birth date of his youngest child and struggled with the birth date of his oldest child. Didn't do a Parenting Capacity Evaluation. Didn't complete other services that were offered to him. And his excuse is, "I was stressed out, or I was busy working." It's a picture of a person who won't let go but he doesn't have the ability to parent these two children. They've been in care for thirty-eight months. I see the phenomena frequently. And the court reiterates its findings which it found earlier now having the benefit of Father's testimony, which is completely made up and unbelievable. It doesn't change the facts. It doesn't change the facts of this case as established by the case workers at the first two hearings.

\*       \*       \*

Father has this fanciful vision of him having some contact with these children. The facts and the reality are quite different. He has not been a father and will not likely be a father notwithstanding this idea that he's going to care for the children. The Children have been cared for by the Department of Welfare. And he's not paying support for the children. He says he takes care of them, yet the taxpayers take care of them. That's the harsh reality.

N.T. Hr'g, 3/15/22, at 53-55.

Following our review, we conclude that the trial court's findings are supported by competent, clear, and convincing evidence in the record, and we find no error in the court's legal conclusions. *See S.P.*, 47 A.3d at 826-27. The record reflects that, at the time of the termination hearing, the Children had been in DHS's care for thirty-seven-and-a-half months. *See* N.T. Hr'g, 3/15/22, at 40. Although Father has been aware of his SCP objectives throughout the life of the case, he has made minimal progress towards reunification. Specifically, in the six-month period preceding the termination petition, Father refused to attend parenting classes, failed to undergo a parenting capacity evaluation, did not complete a required housing assessment, and failed to maintain consistent visitation with the Children. Therefore, we agree with the trial court that, for a period far in excess of the six-month statutory minimum, Father has refused to perform his parental duties to the Children. *See J.T.M.*, 193 A.3d at 409; *see also B., N.M.*, 856 A.2d at 855.

With respect to the explanations for his conduct, Father repeatedly stated that he failed to complete his SCP objectives because DHS "dropped the ball." N.T. Hr'g, 3/15/22, at 17, 36, 52. Further, he claimed that he did not need parenting classes, he had adequate housing, and his missed visits with the Children were caused by DHS. *Id.* at 17. Finally, Father explained that while he "wasn't ready" to care for M.J. in the past, he was now willing and able to provide appropriate housing and care for the Children. *Id.* at 44.

However, in light the evidence presented by DHS at the termination hearings, the trial court concluded that Father's testimony was not credible.

Finally, we note that although Father attended some visits with the Children throughout the life of the case and during the six-month period preceding the termination petition,[4] his inconsistent contact with the Children was insufficient to "demonstrate a serious intent . . . to recultivate a parent-child relationship" or "a willingness and capacity to undertake the parental role." **Z.P.**, 994 A.2d at 1119 (citations omitted).

For these reasons, we discern no abuse of discretion by the trial court in concluding that termination was appropriate under Section 2511(a)(1). Accordingly, Father is not entitled to relief.

### Section 2511(b)

Father also argues that DHS failed to present clear and convincing evidence to prove that termination "would meet the best interests and developmental, physical and emotional needs and welfare of [the Children]." Father's Brief at 31. In support, Father notes that "no expert, psychological or therapeutic evidence or testimony was presented by DHS at trial to establish that the permanent severing of all rights and relationship of [Father] to his children would not cause significant detrimental effect or harm on [the

_____

[4] As noted previously, although Father attended visits with the Children from August until November of 2020, visitation ended after Father missed three scheduled visits and J.B. decided he no longer wanted to see Father. Father made no effort to resume those visits until April of 2021, two months after DHS filed the petition to terminate Father's parental rights.

Children]." ***Id.*** Further, he claims that "[n]o credible evidence was presented at trial as to the potential harm and damage that may occur to [the Children] as the result of permanently severing all relationship, contact and rights of them to [Father]." ***Id.*** Instead, Father asserts that DHS presented "scant and superfluous information on this critical issue, introduced from the non-expert, non-psychological, non-therapeutic testimony of its social worker who is unqualified to give such opinion as a lay person witness." ***Id.*** Therefore, Father argues that the trial court abused its discretion by concluding that termination was in the Children's best interests.

Section 2511(b) states in relevant part:

> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent . . . .

23 Pa.C.S. § 2511(b).

"[T]he focus in terminating parental rights is on the parent, under Section 2511(a), whereas the focus in Section 2511(b) is on the child." ***In re C.L.G.***, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*) (citation omitted). This Court has explained:

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

- 21 -

> In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, . . . the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (citations omitted and formatting altered). "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d 251, 268 (Pa. 2013) (citation omitted).

"In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted). The question is whether the bond between the parent and the child "is the one worth saving or whether it could be sacrificed without irreparable harm to" the child. *Id.* at 764. "Section 2511(b) does not require a formal bonding evaluation" and caseworkers may offer their opinions and evaluations of the bond. *Z.P.*, 994 A.2d at 1121 (citation omitted).

Here, the trial court addressed the Children's best interests as follows:

> Ms. Jackson testified she did not see a parent/child bond between Father and the Children. J.B. has not been in contact with Father recently and he has not displayed any negative effects of not seeing Father. J.B. had requested not to continue visits with Father, but visits were restarted in April 2021. Regarding M.J., who has been in care since he was an infant, the child has not developed a bond with Father. Ms. Jackson opined that

reunification would not benefit the Children because of [the] lack of parental bond with Father and that Father has failed to comply with his SCP objectives. She opined the Children would not suffer irreparable harm if Father's parental rights were terminated and it is in the Children's best interests to be adopted.

Ms. Jackson stated the Children are currently in separate homes, however, . . . one of the foster parents who is currently fostering M.J. stated once she stabilized M.J., [there is a possibility that] she would be willing to have [J.B. and Mother's other child] join their sibling at her house. Ms. Jackson opined [that the Children] would benefit from positive long-term parental relationships.

On cross-examination by Blake Mammuth Esquire, GAL, Ms. Jackson testified that M.J., who is two years old, receives extensive developmental services because he is completely non-verbal. In [Ms. Jackson's] previous conversations with Father, he expressed that he wanted custody of J.B. but not M.J. because he was a baby and needed to be with his Mother. She stated J.B., who is seven years old, receives trauma therapy because he is terrified of Mother and refers to her as a demon. Ms. Jackson has contact with [J.B.'s] therapist, and adoption has been discussed with him and [J.B.] understands. J.B. is very verbal for a child of his age. J.B. is several grades ahead of other children because the schoolwork is too easy for him, and at one point they were talking about possibly skipping him to another grade.

*       *       *

This court heard credible, persuasive testimony from Mike Graves, Esq., [J.B.'s legal counsel,] who testified he spoke to J.B. and explained adoption and his other options. It appeared to [Attorney Graves] that [J.B.] understood what adoption was and told him he was fine where he was now. J.B. told him he would like to be adopted, however, he also stated that he did want to still have visitation with his parents and his prior caretakers.

Trial Ct. Op. at 18-19.

Based on our review of the record, we discern no abuse of discretion by the trial court in concluding that termination of Father's parental rights would best serve the Children's developmental, physical, and emotional needs and

welfare. *See S.P.*, 47 A.3d at 826-27. As noted previously, the trial court credited Ms. Jackson's testimony that the Children did not share a bond with Father and would not suffer irreparable harm if Father's parental rights were terminated. Although Father takes issue with the lack of expert testimony, such evidence is not required in a termination proceeding. *See Z.P.*, 994 A.2d at 1121 (holding that Section 2511(b) does not require a formal bonding evaluation and that caseworkers may offer their opinions and evaluations on whether a bond exists). Therefore, we agree with the trial court that DHS presented clear and convincing evidence demonstrating that termination of Father's parental rights would serve the Children's best interests. *See R.N.J.*, 985 A.2d at 276. Further, although Father claims that he has not had the chance to bond with M.J., this Court has stressed that "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities." *Interest of D.R.-W.*, 227 A.3d 905, 914 (Pa. Super. 2020) (citation and brackets omitted). For these reasons, Father is not entitled to relief.

## Goal Change Orders

Father also argues that the trial court abused its discretion in changing the Children's goal from reunification to adoption by failing to give primary consideration to the Children's best interests. Father's Brief at 31. However, given our disposition concerning the termination of Father's parental rights, we conclude that his appeal from the goal change order is moot. *See D.R.-W.*, 227 A.3d at 917 (concluding that a goal change challenge is moot when

this Court affirms the decree terminating parental rights); *see also In re Adoption of A.H.*, 247 A.3d 439, 446 (Pa. Super. 2021) (stating that "the effect of our decision to affirm the orphans' court's termination decree necessarily renders moot the dependency court's decision to change [a c]hild's goal to adoption" (citation omitted)).  In any event, to the extent Father claims that the trial court failed to give primary consideration to the Children's best interests, his claim is belied by the record for the reasons stated previously. Therefore, Father is not entitled to relief.

For these reasons, we affirm the orders changing the Children's permanency goal from reunification to adoption and the decrees terminating Father's parental rights.

Orders and decrees affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 11/14/2022*